## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| KELLY CRAMER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) ) | **CLASS ACTION COMPLAINT FOR** |
| ORBITAL ATK, INC., DAVID W. THOMPSON, RONALD R. FOGLEMAN, KEVIN P. CHILTON, ROXANNE J. DECYK, LENNARD A. FISK, RONALD T. KADISH, TIG H. KREKEL, DOUGLAS L. MAINE, ROMAN MARTINEZ IV, JANICE I. OBUCHOWSKI, JAMES G. ROCHE, HARRISON H. SCHMITT, and SCOTT L. WEBSTER, | ) ) ) ) ) ) ) ) ) ) ) ) | **VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** <br><br> **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

Plaintiff Kelly Cramer ("Plaintiff"), by her undersigned attorneys, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of herself and the other public holders of the common stock of Orbital ATK, Inc. ("Orbital ATK" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Orbital ATK, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger (the "Proposed Merger") between Orbital ATK and Northrop Grumman Corporation ("Northrop Grumman").

2.      On September 18, 2017, the Board caused the Company to enter into an agreement

and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive $134.50 in cash for each share of Orbital ATK common stock they own (the "Merger Consideration").

3.      On October 25, 2017, the Board authorized the filing of a materially incomplete and misleading definitive Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy incomplete and misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for Orbital ATK; and (ii) the valuation analyses performed by the Company's financial advisor, Citigroup Global Markets Inc. ("Citigroup"), in support of its fairness opinion.

6.      The special meeting of Orbital ATK shareholders to vote on the Proposed Merger is schedule for November 29, 2017. It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the shareholder vote, so that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9. Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless and until the material information discussed below is disclosed to Orbital ATK shareholders, or, in the event the Proposed Merger is

consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9. Personal jurisdiction exists over each Defendant, either, because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Orbital ATK maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

11. Plaintiff is, and at all relevant times has been, an Orbital ATK shareholder.

12. Defendant Orbital ATK is a Delaware corporation and maintains its headquarters at 45101 Warp Drive, Dulles, VA 20166. Orbital ATK is an aerospace and defense systems developer, manufacturer, and supplier of systems and products to the U.S. Government, allied

nations, prime contractors, and other customers. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "OA."

13. Individual Defendant David W. Thompson has served as President, Chief Executive Officer ("CEO"), and a director of the Company and its predecessor since 1982.

14. Individual Defendant Ronald R. Fogleman ("Fogleman") has been non-executive Chairman of the Board since November 2009 and a director of the Company and its predecessor since 2004.

15. Individual Defendant Kevin P. Chilton ("Chilton") has been a director of the Company and its predecessor since 2012.

16. Individual Defendant Roxanne J. Decyk (Decyk") has been a director of the Company and its predecessor since 2010.

17. Individual Defendant Lennard A. Fisk ("Fisk") has been a director of the Company and its predecessor since 1993.

18. Individual Defendant Ronald T. Kadish ("Kadish") has been a director of the Company and its predecessor since 2005.

19. Individual Defendant Tig H. Krekel ("Krekel") has been a director of the Company and its predecessor since 2010.

20. Individual Defendant Douglas L. Maine ("Maine") has been a director of the Company and its predecessor since 2006.

21. Individual Defendant Roman Martinez IV ("Martinez") has been a director of the Company and its predecessor since 2004.

22. Individual Defendant Janice I. Obuchowski ("Obuchowski") has been a director of the Company and its predecessor since 1996.

23.     Individual Defendant James G. Roche ("Roche") has been a director of the Company and its predecessor since 2005.

24.     Individual Defendant Harrison H. Schmitt ("Schmitt") has been a director of the Company and its predecessor since 1983.

25.     Individual Defendant Scott L. Webster ("Webster") has been a director of the Company and its predecessor since 1982.

26.     The parties identified in paragraph 12 through 25 are collectively referred to as Defendants.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the other public shareholders of Orbital ATK (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

28.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of October 10, 2017, there were approximately 57,646,130 shares of Orbital ATK common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country.  The actual number of public shareholders of Orbital ATK will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)      whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.      Background and the Proposed Transaction

29.      Orbital ATK, is an aerospace and defense systems company and supplier of related products to the United States Government, allied nations, prime contractors and other customers. The Company's segments include Flight Systems Group, Defense Systems Group, Space Systems Group, and Corporate. Its products include launch vehicles and related propulsion systems; satellites and associated components and services; tactical missiles, subsystems and defense electronics, precision weapons, armament systems, and ammunition. The Flight Systems Group segment consists of Launch Vehicles Division, Propulsion Systems Division, and Aerospace Structures Division. The Defense Systems Group segment consists of Armament Systems Division, Defense Electronic Division, Missile Products Division, and Small Caliber Systems Division. The Space Systems Group consists of Commercial Satellites Division, Government Satellites Division, Space Components Division, and Technical Services Division.

30.      Northrop Grumman is a global security company. The Company provides products, systems, and solutions in autonomous systems; cyber; command, control, communications and computers, intelligence, surveillance, and reconnaissance (C4ISR); strike, and logistics and modernization. The Company's segments include Aerospace Systems, Mission Systems, and Technology Services. The Company's Aerospace Systems segment is engaged in the design, development, integration and production of manned aircraft, autonomous systems, spacecraft, high-energy laser systems, microelectronics, and other systems/subsystems. The Mission Systems segment offers mission solutions and multifunction systems for Department of Defense (DoD), intelligence community, international, federal civil, and commercial customers. The Technology Services segment provides logistics solutions supporting the full life cycle of platforms and

systems for global defense and federal-civil customers.

31.     On September 18, 2017, Orbital ATK issued a press release announcing the

Proposed Transaction. The press release stated in relevant part:

> FALLS CHURCH and DULLES, Va. — Sept. 18, 2017 — Northrop Grumman Corporation (NYSE: NOC), a leading global security company, and Orbital ATK, Inc. (NYSE: OA), a global leader in aerospace and defense technologies, today announced they have entered into a definitive agreement under which Northrop Grumman will acquire Orbital ATK for approximately $7.8 billion in cash, plus the assumption of $1.4 billion in net debt. Orbital ATK shareholders will receive all-cash consideration of $134.50 per share. The agreement has been approved unanimously by the Boards of Directors of both companies. The transaction is expected to close in the first half of 2018 and is subject to customary closing conditions, including regulatory and Orbital ATK shareholder approval.
>
> "The acquisition of Orbital ATK is an exciting strategic step as we continue to invest for profitable growth. Through our combination, customers will benefit from expanded capabilities, accelerated innovation and greater competition in critical global security domains. Our complementary portfolios and technology-focused cultures will yield significant value creation through revenue synergies associated with new opportunities, cost savings, operational synergies, and enhanced growth. We look forward to welcoming Orbital ATK's talented employees to Northrop Grumman, and believe our combined strength will benefit our customers and shareholders," said Wes Bush, chairman, chief executive officer and president of Northrop Grumman.
>
> "We are very pleased to announce this agreement with Northrop Grumman. It reflects the tremendous value Orbital ATK has generated for our customers, shareholders and employees. The unique alignment in culture and mission offered by this transaction will allow us to maintain strong operational performance on existing programs while we pursue new opportunities that require the enhanced technical and financial resources of a larger organization. Our employees will also benefit from greater development and career opportunities as members of a larger, more diverse aerospace and defense enterprise. We will remain focused on operational excellence and execution during and after the transition into Northrop Grumman," said David Thompson, president and chief executive officer of Orbital ATK.
>
> Upon completion of the acquisition, Northrop Grumman plans to

establish Orbital ATK as a new, fourth business sector to ensure a strong focus on operating performance and a smooth transition into Northrop Grumman. On a pro forma 2017 basis, Northrop Grumman expects to have sales in the range of $29.5 to $30 billion based on current guidance. Northrop Grumman expects the transaction to be accretive to earnings per share and free cash flow per share in the first full year after the transaction closes, and to generate estimated annual pre-tax cost savings of $150 million by 2020.

## II.   The Merger Consideration Fails to Fairly Compensate Orbital ATK Shareholders

32.   The Merger Consideration is inadequate given Orbital ATK's recent financial performance and strong growth prospects.

33.   In the year leading up to the announcement of the Proposed Merger, Orbital ATK's stock price increased over 50%, going from $72.48 on September 16, 2016 to $110.04 on September 15, 2017, illustrated by the chart below:



34.   Indeed, on August 3, 2017, the Company announced positive financial results for the 2017 second quarter. The Company reported revenues of $1,115 million in the second quarter

of 2017, up 2.9% from $1,084 million in the second quarter of 2016, and increased its revenue and earnings per share guidance of the remainder of 2017. David W. Thompson announced:

> Based on our strong results in the second quarter and a positive outlook for remainder of the year, we are on track to exceed our initial financial objectives for 2017. The revenue growth that is now being realized stems from exceptional new business performance over the past two years. Operational performance has also been outstanding across all business segments as we continue to execute our programs on schedule, producing reliable, affordable and innovative products that support the vital work being carried out by our customers.

35.     Orbital ATK's good news has continued since announcing the deal. On September 19, 2017, the Company announced that the U.S. Army placed an additional $123 million in orders under production contract Option 2 for the Precision Guidance Kit (PGK) that will continue to deliver PGK's to the warfighter. Orbital ATK had previously signed a $69 million production option in July 2016 under the same Option 2. Additionally, on October 24, 2017, the Company announced they received a $24 million contract from Lockheed Martin to produce additional composite components for the F-35 Joint Strike Fighter.

36.     Finally, Citigroup valued the Company at a higher price than the Merger Consideration. Citigroup calculated an implied equity value per share of up to $157.15, substantially higher than the $134.50 Merger Consideration.

37.     In sum, the Merger Consideration appears to inadequately compensate Orbital ATK shareholders for their shares.  Given the Company's strong financial results and growth potential, it appears that the Merger Consideration is not fair compensation for Orbital ATK shareholders. It is therefore imperative that the Company's shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for shareholders to properly exercise their corporate suffrage rights and make an informed decision

concerning whether to vote in favor of the Proposed Merger.

**III.    The Merger Agreement's Deal Protection Provisions Deter Superior Offers**

38.    In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the Merger Agreement that operate conjunctively to deter other suitors from submitting a superior offer for Orbital ATK.

39.    First, the Merger Agreement contains a no solicitation provision that prohibits the Company or the Individual Defendants from taking any affirmative action to obtain a better deal for Orbital ATK shareholders. The Merger Agreement states that the Company and the Individual Defendants shall not:

> (i) directly or indirectly solicit, initiate or knowingly encourage, or take any other action to knowingly facilitate, any takeover proposal or any inquiries or the making of any proposal that would reasonably be expected to result in or lead to a takeover proposal; or (ii) enter into, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any person, or any such person's representative, information with respect to or in connection with, or otherwise knowingly cooperate with any person with respect to, any takeover proposal or any inquiries or proposals that would reasonably be expected to result in or lead to a takeover proposal.

40.    Additionally, the Merger Agreement grants Northrop Grumman recurring and unlimited matching rights, which provides Northrop Grumman with: (i) unfettered access to confidential, non-public information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) three business days to negotiate with Orbital ATK, amend the terms of the Merger Agreement, and make a counter-offer in the event a superior offer is received.

41.    The non-solicitation and matching rights provisions essentially ensure that a superior bidder will not emerge, as any potential suitor will undoubtedly be deterred from expending the time, cost, and effort of making a superior proposal while knowing that Northrop

Grumman can easily foreclose a competing bid.  As a result, these provisions unreasonably favor Northrop Grumman, to the detriment of Orbital ATK's public shareholders.

42.     Lastly, the Merger Agreement provides that Orbital ATK must pay Northrop Grumman a termination fee of $275,000,000 in the event the Company elects to terminate the Merger Agreement to pursue a superior proposal.  The termination fee provision further ensures that no competing offer will emerge, as any competing bidder would have to pay a naked premium for the right to provide Orbital ATK shareholders with a superior offer.

43.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.

44.     Given that the preclusive deal protection provisions in the Merger Agreement impede a superior bidder from emerging, it is imperative that Orbital ATK's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Merger.

IV.     **The Proxy Is Materially Incomplete and Misleading**

45.     On October 25, 2017 Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger. The Individual Defendants were obligated to carefully review the Proxy to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information, in violation of Sections 14(a) and 20(a) of the Exchange Act, that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger.

46.     First, Orbital ATK management fails to provide complete and accurate projections of the Company, so that shareholders can obtain a true sense of its present and future value. In

Citigroup's *Discounted Cash Flow Analysis* section, the Proxy describes that the cash flow projections provided by the Company's management have been altered from their original form. "Additional cash flow items" and net environmental remediation payments have been removed from the stated cash flows forecasted for years 2018-2020. Additionally, the Proxy fails to describe whether the Free Cash Flow line items, included on page 51 of the *Certain Unaudited Prospective Financial Information* section, are unlevered free cash flows.

47.     True and accurate unlevered free cash flows are material to the Company's shareholders. Indeed, investors are concerned, perhaps above all else, with the unlevered free cash flows of the companies in which they invest.  Under sound corporate finance theory, the value of stock should be premised on the expected unlevered free cash flows of the corporation. Accordingly, the question that the Company's shareholders need to assess in determining whether to vote in favor of the Proposed Merger is clear – is the Merger Consideration fair compensation given the Orbital ATK's expected unlevered free cash flows?  Without complete and accurate unlevered free cash flow projections, the Company's shareholders will not be able to answer this question and assess the fairness of the Merger Consideration.

48.     With respect to Citigroup's *Discounted Cash Flow Analysis*, the Proxy fails to disclose the following key components used in their analysis: (i) the financial impact of removing the "additional cash flow items" and net environmental remediation payments from both the cash flows and the WACC calculations; (ii) the inputs and assumptions underlying the calculation of the discount rate range of 6.9% to 8.2%; (iii) the inputs and assumptions underlying the selection of the range of perpetuity growth rates of 1.5% to 2.5%; and (iv) the actual range of terminal values calculated and utilized in the Analysis.

49. These key inputs are material to Orbital ATK shareholders, and their omission renders the summary of Citigroup's *Discounted Cash Flow Analysis* on page 47-48 of the Proxy incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions – in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id*. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion *unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices*. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

50. With respect to the Citigroup' *Selected Public Companies* and *Selected Transactions* Analyses, the Proxy fails to disclose the individual multiples Citigroup calculated for each company and transaction utilized. The omission of these multiples renders the summary of these analyses and the Implied Per Share Equity Value Reference Range**s** materially misleading. A fair summary of Companies and Transactions analyses requires the disclosure of the individual multiples for each company and transaction; merely providing the range and a median is

insufficient, as shareholders are unable to assess whether the banker applied appropriate multiples, or, instead, applied unreasonably low multiples in order to drive down the implied share price ranges.

51.     With respect to Citigroup's *Precedent Premiums Paid Analysis*, the Proxy fails to disclose a full range of values, the number of deals reviewed, or the individual premiums used to prepare the comparative analysis. A fair summary of this analysis requires the disclosure of the individual premiums for each transaction observed, or at least a full range of values. Providing only the selected range without any further details is insufficient. The omission of this information renders the summary of this analysis set forth on page 48 of the Proxy materially incomplete and misleading.

52.     With respect to Citigroup's *Analyst Price Targets*, the Proxy fails to disclose the individual price targets reviewed and utilized in the analysis, and whether any take-out prices were known and/or available. The omission of this information renders the corresponding summary materially misleading. Further, the Citigroup applied a steep discount rate to unfairly lower the already deflated values. It is important to note that price targets are a predictive valuation of what a stock is worth on its own.[1] They do not account for premiums associated with a merger or takeover. A "take-out price", or the price that analysts predict in the event a merger or takeover, would include those premiums and be significantly higher. A fair summary of price targets requires the disclosure of the individual targets observed from each equity research analyst; merely providing the range or inappropriate calculations based on a range is insufficient, as shareholders are unable to assess whether the banker summarized fairly, or, instead, provided only the figures

---

[1] See http://www.investopedia.com/terms/p/pricetarget.asp

that best present the price targets in light of to the Merger Consideration, i.e. as low as possible.

53.     In sum, the omission of the above-referenced information renders statements in the Proxy materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

54.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

55.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

56.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

57.    The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

58.    Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger.   Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company; and (ii) the valuation analyses performed by Citigroup in support of its fairness opinion.

59.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

60.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy states that Citigroup reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Citigroup as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company.

61.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to review Citigroup's analyses in connection with their receipt of the fairness opinion, question Citigroup as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

62.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

63.     Orbital ATK is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

64.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

65.     Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

66.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

67.     The Individual Defendants acted as controlling persons of Orbital ATK within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Orbital ATK, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

68.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

69.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing this document.

70.     In addition, as the Proxy sets forth at length, and as described herein, the Individual

Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

71.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

72.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

73.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and her counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages

sustained as a result of their wrongdoing;

       D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses;

       E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

      Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: October 25, 2017

Respectfully submitted,

/s/ Elizabeth K. Tripodi
ELIZABETH K. TRIPODI (VSB #73483)
LEVI & KORSINSKY, LLP
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Telephone:    (202) 524-4290
Facsimile:    (202) 333-2121
Email: etripodi@zlk.com

*Attorneys for Plaintiff*

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com